JUDGE CAPRONI

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x

MARIA LAMPLEY, CLAUDIA MELARA
and DAWN SPRAGUE,

              Plaintiffs,

       -against-

ALEXANDER ROJAS and
THE CITY OF NEW YORK,

              Defendants.
------------------------------------------------------------x

14 Civ. _____

COMPLAINT

PLAINTIFFS DEMAND
A TRIAL BY JURY



RECEIVED
NOV 0 5 2014
U.S.D.C. S.D.N.Y.
CASHIERS

Plaintiffs Maria Lampley ("Lampley"), Claudia Melara ("Melara") and Dawn Sprague ("Sprague") (collectively, "plaintiffs"), by their counsel, The Law Office of Kevin Mintzer, P.C. and Cuti Hecker Wang LLP, complaining of defendants Alexander Rojas ("Rojas") and The City of New York ("City"), (collectively, "defendants") allege as follows:

## NATURE OF CLAIMS

1.     Rojas, a Lieutenant in the New York City Police Department ("NYPD") and the third in command of the 44th Precinct in Bronx (the "Precinct"), has subjected plaintiffs, three New York City police officers, to egregious sexual harassment. As explained below, Rojas's unlawful behavior has included groping the intimate areas of plaintiffs' bodies; displaying to plaintiffs videos of him engaged in masturbation and other sexual acts; exposing his penis to plaintiffs; making unwelcome sexual advances to plaintiffs and requesting sexual favors from them. In addition, Rojas has used his supervisory authority over plaintiffs to retaliate against them because they have opposed his discriminatory acts and would not submit to his sexual advances.

2.     Since plaintiffs began working for Rojas, they have tried dealing with his harassing behavior in different ways, always mindful that Rojas is one of the most powerful people in the 44th Precinct and has the power to destroy their careers.  Sometimes plaintiffs have ignored Rojas. Other times they have tried to outwardly appear to laugh at his comments in the hopes of placating him.  But many times, plaintiffs have screamed at Rojas to stop, particularly when he touched them in the most intimate areas of their bodies.  However, as described below, Rojas has refused to stop his unrelenting harassment of plaintiffs and would punish them when they protested aggressively.

3.     Plaintiffs bring this action to remedy discrimination on the basis of gender in employment, including hostile work environment sexual harassment, and retaliation based on the opposition to unlawful employment practices, in violation of the Equal Protection Clause of the Fourteenth Amendment of the Constitution of the United States ("Equal Protection Clause") through 42 U.S.C. § 1983 ("Section 1983"), the New York City Human Rights Law, Administrative Code of the City of New York § 8-107 *et seq.* (the "NYCHRL"), and New York common law.

4.     Plaintiffs seek injunctive and declaratory relief, compensatory and punitive damages, and other appropriate legal and equitable relief pursuant to Section 1983, the NYCHRL, and New York common law.

PARTIES, JURISDICTION AND VENUE

5.      Plaintiff Maria Lampley is a 35-year-old woman.  She has been employed by the City in the NYPD for over ten years. From approximately 2005 through the present, Lampley has been a Police Officer assigned to work in the 44th Precinct.

2

6.      Plaintiff Claudia Melara is a 35-year-old woman.  She has been employed by the City in the NYPD for about ten years.  From approximately 2005 through the present, Melara has been a Police Officer assigned to work in the 44th Precinct.

7.      Plaintiff Dawn Sprague is a 43-year-old woman.  She has been employed by the City in the NYPD for over 12 years.  From approximately 2003 through the present, Sprague has been a Police Officer assigned to work in the 44th Precinct.

8.      Defendant Alexander Rojas is an Administrative Lieutenant in the NYPD.  From approximately 2011 through the present, Rojas has been the third highest-ranking officer in the 44th Precinct and has maintained supervisory responsibility for all administrative employees in the Precinct, including plaintiffs.  At all relevant times, Rojas acted under color of state law.

9.      Defendant City of New York is a municipality and is plaintiffs' "employer" within the meaning of the NYCHRL.

10.     This Court has federal question jurisdiction over plaintiffs' federal claims pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343 and supplemental jurisdiction over plaintiffs' city law claims pursuant to 28 U.S.C. § 1367.

11.     This Court is an appropriate venue for this action pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to the claim occurred in the Southern District of New York.

12.     Pursuant to § 8-502(c) of the NYCHRL, plaintiffs will serve a copy of this Complaint on the City of New York Commission on Human Rights and the Corporation Counsel of the City of New York.

FACTUAL ALLEGATIONS

Facts Related to Sprague

13.     In or about March 2012, after Sprague returned to work from a maternity leave, she was assigned to an administrative position, working for Rojas.  Later that year, Sprague was given the title of "plant manager," but her duties did not change.

14.     As plant manager, Sprague is responsible for overseeing building repairs and work orders related to the Precinct and other administrative duties such as the scheduling of vacations for officers in the Precinct. Sprague is also the Precinct's ASPCA liaison and is responsible for the Precinct's animal cruelty cases.

15.     Since March 2012 when Sprague began to report directly to Rojas, he has had control over her job assignments and employment status.

16.     By the summer of 2012, Rojas had begun to act in an overly familiar and inappropriate manner toward Sprague.  For example, Rojas began touching and rubbing Sprague's back while telling her that she was doing a good job.

17.     Around the same time, Rojas began to make unwelcome contact with Sprague when they would pass each other in close quarters.  For example, Rojas began to brush his groin area against Sprague's buttocks while walking by Sprague in a narrow hallway when she was using the copy machine.  Similarly, Rojas began brushing his arm and hand on Sprague's breasts when they came in close proximity. Although Rojas pretended that these contacts were unintentional, it became apparent to Sprague that they were deliberate.

18.     In or about the fall of 2012, Rojas's advances to Sprague became more aggressive.  Rojas told Sprague repeatedly that he was attracted to her and began asking her on

4

dates.  Sprague told him that she was not interested in dating him.  However, this did not deter Rojas.

19.    By late 2012, Rojas began routinely making sexually explicit comments to Sprague such as "I want to eat your pussy," "I want to fuck you," and "can you suck my cock." Rojas also regularly began to question Sprague in explicit terms about whether she was having sexual relations with anyone else and to make comments about Sprague's body, particularly her breasts and her vagina.  Rojas also began to refer to Sprague in sexually derogatory terms such as "whore."

20.    In or about December 2012, Rojas asked Sprague to come inside his office.  Once Sprague was in his office, Rojas asked her whether she knew a particular "girl" who worked at another police precinct.  Rojas then played on a cell phone an explicit video of a woman performing oral sex on a man whose face was not visible.  Rojas informed Sprague that the man in the video was himself and again asked Sprague if she knew the woman in the video.  Sprague told Rojas in vehement terms that she did not want to watch the video.

21.    Over the next several months, Rojas regularly played the same video of him receiving oral sex in Sprague's presence, often displaying the phone directly in front of her face. On other occasions, Rojas left the phone on Sprague's desk with the video playing.

22.    In or about January 2013, Sprague was working overtime in the administrative office. Rojas told Sprague that he was feeling "horny" and walked over to Sprague's desk. When Sprague looked at Rojas, she saw that his penis was exposed, and Rojas asked Sprague to touch it.  Sprague screamed at Rojas and quickly walked away.

23.    On three occasions between October 2013 and April 2014, while Sprague was driving Rojas from the 44th Precinct to NYPD headquarters in Manhattan and Rojas was sitting

in the passenger seat of the car, Rojas took his penis out of his pants and sat in the car for an extended period with his penis exposed.

24.     In or about January 2014, Rojas became even more aggressive in his physical harassment and abuse of Sprague.  On multiple occasions between January and October 2014, Rojas grabbed or attempted to grab Sprague's breasts, buttocks, and vaginal area.  Rojas also tried to kiss Sprague on the mouth.

25.     On one occasion when Rojas grabbed Sprague's breast, he did so in front of her two-year-old son, which caused the boy to become frightened and upset.

26.     Each time Rojas touched Sprague in a sexual manner, Sprague emphatically told Rojas that he should stop and never do it again.  Despite these statements, Rojas persisted in his conduct.

27.     Beginning in or about March 2014 and continuing through October 2014, Rojas repeatedly showed Sprague a video on his cell phone of Rojas masturbating.  Sprague told Rojas that she had no interest in viewing the video.  However, Rojas persisted in displaying the video in front of Sprague's face.  He also told Sprague that he wanted her to watch the part of the video that showed him ejaculating.

28.     Because Sprague has opposed Rojas's sexual advances, his requests for sex, and his other sexually abusive behavior, Rojas has retaliated against Sprague in various ways.  For example, at various times when Sprague did not favorably respond to his unlawful conduct, Rojas told Sprague that her position in the administrative office "wasn't working out" or that she was on "shaky ground" and threatened her job.

29.     Rojas has also retaliated against Sprague by changing her working hours.  For many years, Sprague's normal workday was 7:00 a.m. to 3:00 p.m. However, in or about

September 2013, because Sprague would not submit to Rojas' sexual advances and other unlawful behavior, Rojas insisted that Sprague work from 9:00 a.m. to 5:00 p.m.

30.     Rojas has also retaliated against Sprague by screaming at her and otherwise acting abusively toward her. Most recently, in October 2014, Rojas became so angry with Sprague that, in the course of snatching several files out of her hands, he punched Sprague in the chest, causing her to fall backwards.

Facts Related to Melara

31.     In or around 2005 through April 2014, Melara worked on patrol in the 44th Precinct, responding to 911 calls.

32.     In April 2014, Rojas offered Melara an administrative position in the crime analysis office of the 44th Precinct.  In that role, Melara reports to a sergeant, who in turn reports directly to Rojas.  As Melara's second level supervisor, Rojas has control over her work assignments and her employment status.

33.     Shortly after Melara began working in the crime analysis position, Rojas regularly began to hug Melara and massage her shoulders.  This touching was not initiated by Melara and was unwelcome.

34.     Rojas continued this behavior throughout the spring and summer 2014. Moreover, as time went on, Melara began to notice that, when Rojas hugged her or touched her back, his hand went progressively lower on her body, sometimes going so far as to squeeze her buttocks.  In addition, Rojas repeatedly grabbed Melara's waist when he saw in the hallway or in passing.  When this happened, Melara pulled away from Rojas and told him to stop, but this did not deter his behavior.

35.     In or about the summer of 2014, Rojas also began inviting Melara out for drinks or to "hang out" outside of work.  Melara declined these invitations and frequently reminded Rojas that she was married and had a young child.  In response, Rojas asked Melara if she was happily married and suggested that her husband would not find out of if he and Melara went out.

36.      In or about early September 2014, Melara was standing by the copy machine on the second floor of the 44th Precinct when Rojas walked by her and touched her buttocks with an open hand. Melara told Rojas he should not touch her, but Rojas repeated this behavior on several occasions.

37.     In or about September 2014, Rojas called Melara into his office and showed her his cell phone.  Displayed on phone's screen was a picture of a penis.  Rojas said to Melara: "This is me. Do you like it?" Melara immediately left his office.

38.     On another occasion in September 2014, Rojas informed Melara that she needed to write a report and that he had an email on his computer related to the subject of the report that she needed to see.  When Melara entered Rojas's office, she saw that Rojas had placed in front of his computer a cell phone displaying the same picture of a penis that Rojas had previously showed her.  Melara immediately left Rojas's office.

39.     Approximately two days later, Rojas showed Melara a video on his cell phone of a man masturbating.  The man's face was not visible in the video, but Rojas told Melara that the video was of him.  Melara immediately walked away from Rojas.

40.     In or about early October 2014, Melara and Sprague were talking with Rojas, who was carrying a stack of papers.  In the middle of a discussion about work, Rojas revealed that he was carrying a pornographic magazine among his papers.

41.     Due to Rojas's conduct toward Melara, she started to try to avoid him and to minimize their interactions.  However, because Melara has been unwilling to go out with him and because she has protested Rojas's touching of her body, Rojas has begun to retaliate against Melara. In particular, Rojas has repeatedly assigned Melara to overtime tours at times he was aware that Melara had other commitments, and even though other officers with less seniority than Melara were available to take the assignments.  In addition, at times Rojas has threatened to remove Melara from a particular tour that she has regularly worked since she began in the administrative role.

Facts Related to Lampley

42.     In or around January 2013, Lampley began her current assignment.  In that role, Lampley provides administrative support to two Lieutenants at the 44th Precinct.  One of those Lieutenants is in charge of special operations and the other is in charge of special projects.

43.     While Lampley currently has a direct report to other Lieutenants, Rojas's position as third in command overall at the Precinct, and his specific oversight and control of administrative and personnel matters, empowers him with authority and control over Lampley, including with respect to her work assignments and employment status.

44.     Since beginning her current administrative duties, Rojas commented on Lampley's attire and began making remarks about her body parts.  Over time he became more aggressive, talking about how "nice and big" her buttocks were.  Lampley has made it clear to Rojas that these comments were not welcome.

45.     Rojas frequently asked Lampley to go out with him or tried to engage in sexual banter by asking her about her sex life.  Lampley refused to engage in these discussions.  In response, Rojas would at times call her a "bitch," or call her boyfriend a "perp."

46.     Rojas also began unwanted touching of Lampley, first by massaging her shoulders and then over time moving his hand further down her back until he would reach down to her buttocks.  Lampley pushed Rojas away or squirmed away from him, even though he is taller and bigger than Lampley.

47.     Lampley's efforts to push Rojas away from her did not deter him.  He created opportunities to push past Lampley in the hallway and force himself against her.  When Lampley was using a copy machine, Rojas walked behind her and brushed his groin area up against her backside.  On at least one occasion, Rojas came up to Lampley while she was working at her desk and pushed his groin up against her hand on the edge of her desk.  Lampley always made very clear that this disgusting behavior offended her, often openly shouting at Rojas.

48.     Over time, Rojas became more aggressive.  On multiple occasions, he called Lampley up to his office, where he grabbed her and lunged in for a kiss.  Although Lampley pushed back and protested, Rojas at times managed to close his office door, physically blocking Lampley's exit, then turn off the lights and grope Lampley's breasts, vagina and buttocks, and grab her by the face, continuing to try to kiss her.  Only after significant struggle was Lampley able to shove Rojas off and escape.

49.     In or around the summer of 2014, Rojas again called Lampley into his office, this time while he sat at his desk.  He indicated he had something for her, which she understood related to her work.  As she stepped into his office, Rojas pulled his chair back to reveal his penis protruding from his pants.  Lampley shouted at Rojas and rushed out of the office.  On another occasion, Rojas again called Lampley to his office to discuss work and then began to unzip his pants.  Again, Lampley shouted and ran out of the office.

50.     On multiple occasions, Rojas showed or attempted to show Lampley pornographic videos that he claimed depicted him masturbating.  For example, Rojas called Lampley into his office and indicated that he had a paper she needed and then pointed her to a cell phone propped up against his computer, showing a man masturbating.  Lampley always made clear that she thought this was disgusting, offensive material.  Rojas nonetheless asked her if she wanted to see the real thing.

51.     Rojas also sent Lampley a picture of his penis by text message after jokingly saying it was his thumb, and asked her if she wanted to suck it.

52.     On at least one occasion, Rojas revealed that he had cropped a photograph of Lampley to highlight the cleavage of her breasts.

53.     Rojas has regularly punished Lampley for refusing his advances and refusing to tolerate his behavior, including by assigning her undesirable tasks or patrols or forcing her to work hours or shifts on the weekend with little notice.

54.     For example, Rojas has taken away all of Lampley's regular days off and forced her to cover the UN, even after Lampley informed Rojas that her mother was suffering from breast cancer and that she needed her regular days off to take her mother to the doctor.

55.     On other occasions, Rojas has assigned Lampley duties that are routinely given to officers with less seniority or told her with less than full notice that she had to report for a weekend tour.  On at least one occasion, Rojas tried to report Lampley for abusing her sick leave, even though she had not done so.

## FIRST CAUSE OF ACTION

### Sex Discrimination/Sexual Harassment Under Section 1983

(Against Rojas)

56.     Plaintiffs repeat and reallege paragraphs 1-55 as if fully set forth herein.

57.     By the acts and practices described above, Rojas, in his individual capacity and under color of state law, discriminated against plaintiffs in the terms and conditions of their employment on the basis of their sex, including creating a hostile work environment based on sex, thus depriving plaintiffs of their rights under the Equal Protection Clause, in violation of Section 1983.

58.     As a result of the discriminatory acts of Rojas, plaintiffs have suffered and will continue to suffer irreparable injury, monetary damages, and damages for mental anguish, emotional distress, and humiliation unless and until this Court grants relief.

59.     Rojas engaged in these practices with malice and with reckless indifference to plaintiffs' federally protected rights.

SECOND CAUSE OF ACTION

Retaliation Under Section 1983

(Against Rojas)

60.     Plaintiffs repeat and reallege paragraphs 1-60 as if fully set forth herein.

61.     By the acts and practices described above, Rojas retaliated against plaintiffs because they opposed unlawful discrimination, thus depriving plaintiffs of their rights under the Equal Protection Clause, in violation of Section 1983.

62.     The retaliatory actions Rojas has taken against plaintiffs are likely to dissuade a reasonable employee from engaging in protected activity.

63.     Plaintiffs are now suffering and will continue to suffer irreparable injury, monetary damages, and damages for mental anguish and humiliation as a result of Rojas's retaliatory acts.

64.     Rojas engaged in these practices with malice and with reckless indifference to plaintiffs' federally protected rights.

THIRD CAUSE OF ACTION

Sex Discrimination/Sexual Harassment Under the NYCHRL

(Against Rojas and the City)

65.     Plaintiffs repeat and reallege paragraphs 1-64 as if fully set forth herein.

66.     By the acts and practices described above, defendants discriminated against plaintiffs in the terms and conditions of their employment on the basis of their sex, including by creating a hostile work environment because of their sex, in violation of the NYCHRL.

67.     The City is liable under the NYCHRL as plaintiffs' employer.

68.     Rojas is liable under the NYCHRL as plaintiffs' employer because he has the authority to take personnel actions against plaintiffs and does not merely implement personnel decisions made by others.   In addition, Rojas is liable to plaintiffs because he personally discriminated against plaintiffs and participated in the creation of a sexually hostile work environment.

69.     As a result of the discriminatory acts of defendants, plaintiffs have suffered and will continue to suffer irreparable injury, monetary damages, and damages for mental anguish, emotional distress, and humiliation unless and until this Court grants relief.

70.     Defendants engaged in these practices with malice and with reckless indifference to plaintiffs' protected rights under the NYCHRL.

FOURTH CAUSE OF ACTION

Retaliation Under the NYCHRL

(Against Rojas and the City)

71.     Plaintiffs repeat and reallege paragraphs 1-70 as if fully set forth herein.

72.     By the acts and practices described above, defendants retaliated against plaintiffs because they opposed unlawful discrimination, in violation of the NYCHRL.   The retaliatory

13

actions defendants have taken against plaintiffs are likely to dissuade a reasonable employee from engaging in protected activity.

73.     Plaintiffs are now suffering and will continue to suffer irreparable injury, monetary damages, and damages for mental anguish and humiliation as a result of defendants' retaliatory acts.

74.     Defendants acted intentionally and with malice and/or reckless indifference to plaintiff's statutory rights.

## FIFTH CAUSE OF ACTION

### Assault and Battery Under New York Common Law

### (Against Rojas)

75.     Plaintiffs repeat and reallege paragraphs 1-74 as if fully set forth herein.

76.     During plaintiffs' employment with the City, Rojas repeatedly subjected them to unwanted bodily contact.

77.     Rojas's repeated attempts to touch plaintiffs left them in imminent apprehension of harmful contact.

78.     Rojas's repeated attempts to touch plaintiffs in a sexual manner and his actual touching of plaintiffs in a sexual manner were knowingly offensive.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs respectfully request that this Court enter an award:

(a)     declaring the acts and practices complained of herein in violation of Section 1983 and the NYCHRL;

(b)     permanently restraining these violations;

(c)     directing defendants to take such affirmative action as is necessary to ensure that the effects of these unlawful employment practices are eliminated and do not continue to affect plaintiffs' employment opportunities;

(d)     directing defendants to place plaintiffs in the position they would be in but for defendants' discriminatory treatment of them and to make them whole for all earnings they would have received but for defendants' discriminatory treatment;

(e)     awarding plaintiffs compensatory damages for their mental anguish, emotional distress, and humiliation;

(f)     awarding plaintiffs punitive damages against defendant Rojas;

(g)     awarding plaintiffs pre-judgment and post-judgment interest, as well as reasonable attorneys' fees and the costs of this action; and

(h)     awarding such other and further relief as the Court deems necessary and proper.

<u>DEMAND FOR JURY TRIAL</u>

Pursuant to Rule 38(b) of he Federal Rules of Civil Procedure, plaintiffs demand a trial by jury in this action.

Dated: New York, New York
       November 6, 2014

THE LAW OFFICE OF
KEVIN MINTZER, P.C.

By:   /s/ Kevin Mintzer
Kevin Mintzer
1350 Broadway – Suite 1400
New York, New York 10018
Tel: (646) 843-8180
km@mintzerfirm.com

CUTI HECKER WANG LLP

By:   /s/ Mariann Meier Wang
305 Broadway – Suite 607
New York, New York 10007
(212) 620-2603
mwang@chwllp.com

15